## WATSON v. TAYLOR.

### No. 1264.  Opinion Refiled April 15, 1913.

1. **RAPE—Civil Liability of Perpetrator.**  Rape of a female gives her a cause of action for damages against the perpetrator.

2. **SAME—Definition of Crime.**  Rape, as defined by the second subdivision of section 2353, Comp. Laws 1909, is an act of sexual intercourse accomplished with a female, not the wife of the perpetrator, where the female is over the age of sixteen years and under the age of eighteen, and of previous chaste and virtuous character.

3, **SAME—Action for Damages—Defenses—Consent of Female.**  To show that such a female consented to the act or acts of sexual intercourse will not constitute a defense to a civil action to recover damages for an assault upon her committed in such manner and under such circumstances as to constitute rape.

4. **APPEAL AND ERROR—Theory of Case—Consistency on Appeal.**  The cause was submitted below upon the theory that in order for the plaintiff to maintain her cause of action, it was necessary to satisfy the jury that if the defendant had sexual intercourse with her it was accompanied with intent on his part to effect that purpose in defiance of all resistance and without her consent.  Held, that on appeal it must be reviewed upon the same theory.

5. **RAPE—Civil Liability—Sufficiency of Evidence.**  Evidence examined, and held sufficient to authorize the submission of the cause to the jury, and to sustain the verdict rendered thereon.

6. **SAME—Admissibility of Evidence—Offspring as Exhibit.**  In an action for damages for rape, a child two and a half years of age, alleged to be the fruit of the illicit intercourse, may be exhibited to the jury by the plaintiff for the purpose of establishing the facts of birth and of prior unlawful intercourse.

(Syllabus by the Court.)

*Error from District Court, Canadian County;*
*John J. Carney, Judge.*

Action by Marietta Taylor, by her next friend, E. E. Taylor, against H. F. Watson. Judgment for plaintiff, and defendant brings error. Affirmed.

*E. G. McAdams*, for plaintiff in error.

*H. L. Fogg*, for defendant in error.

KANE, J. This was a civil action for damages, commenced by the plaintiff, Marietta Taylor, by her next friend, E. E. Taylor, for a rape committed upon her by the defendant, H. F. Watson. Upon trial to a jury there was a verdict for the plaintiff, upon which judgment was duly entered, to reverse which this proceeding in error was commenced. For convenience the parties hereafter will be called plaintiff and defendant, respectively, as they appeared in the court below.

The evidence of the plaintiff was to the effect that she was an unmarried female, seventeen years of age, of chaste character previous to the time of her relations with the defendant; that the defendant was a neighbor of her family, with whom she resided, and often visited their home on terms of friendly intimacy. That two or three weeks before Christmas, 1905, her mother sent her to the well near the house to get a pail of water; that just after she turned around to leave the well, the defendant came out of the dark, took hold of her arm and pushed her toward the orchard some twenty steps, and there threw her down and commenced to pull up her clothes; that she called to her mother, whereupon the defendant jumped up and ran away, warning her not to tell what had happened; that she did not tell what happened because she was afraid of the defendant. As to what was said and done on that occasion, she testified:

"A. He said come on and go with him; I said no; he said yes, come on; and I said no, and hollered for ma; but she didn't hear me; the house was shut up, and he taken me on down across the road, the road that led into the orchard, and he threw me down there."

That a short time after the incident at the well, she and her mother accompanied the Watson family to a box supper in the neighborhood; that, at the invitation of the Watson family, the

Taylor family consented to remain over night at their home; that there were not quilts enough at the Watson home to provide for their guests, and the plaintiff and defendant and his daughter went to the Taylor home in a wagon to supply the deficiency; that, upon arriving at the Taylor home, the plaintiff told defendant and his daughter to go into the house and get the quilts, whereupon defendant required his daughter to hold the team and he accompanied plaintiff into the house; that, after entering the house, the defendant came into the room where the plaintiff was and threw a quilt on the floor and threw her down upon it, and attempted to take improper liberties with her; that, after struggling with him and pushing him away, he desisted, whereupon they all returned to the Watson home. That, a short time after this, the plaintiff remained overnight at the Watson home for the purpose of accompanying Mrs. Watson to Oklahoma City the next morning; that sometime during the night the defendant entered her room, lighted a match, and looked over at a bed where his two little boys were asleep, and then sat down on her bed; that he attempted to have sexual intercourse with her, but did not succeed, and left the room warning her that she "had best not tell anyone what had happened." That on the 14th of January thereafter plaintiff spent the night at the Watson home; that sometime during the night she awoke and saw the defendant standing by her bed. Her testimony as to what occurred is as follows:

"Q. You say when you woke up he was standing there? A. Yes, sir. Q. Did he say anything to you? A. Yes, sir. Q. What did he say? A. He said that I had better not tell it. I told him to get out of there, and he said no, and after he got in bed and had sexual intercourse he told me I had better not tell it. Q. What did he say before that? A. That it would not hurt me, or that he would either bet his farm or give his farm it would not hurt me or amount to anything. Q. Then what did he do? A. He went out and unlocked the door and went out in through the kitchen, and in about a half hour he came back in and did the same. Q. Did you scream out or holler? A. No, sir; I was scared. Q. Why didn't you scream out? A. Because I was so scared and nervous that I could not holler. Q. And what did you do, if anything, in resisting him? A. I turned over on my stomach, and he took hold of me and turned me back over."

On the 8th of the following October a child was born to the plaintiff which she testified was the fruit of her intercourse with the defendant. Plaintiff testified further as follows:

"Q. When was the first time you ever told anybody about this? A. The 30th of August. Q. The 30th of August, 1906; you say this last time occurred on the 14th of January, and you never told anybody about it until the 30th of August? A. Yes, sir. Q. You had been pregnant about seven months about that time, hadn't you? A. I guess so. Q. It was so that it was quite perceptible, wasn't it? A. Yes, sir. Q. And it got to where you could not conceal it any longer and you told your mother about it? A. She asked, and I told her. Q. Did you ever tell Watson anything about it—that you were in a family way? A. No, sir; I never did. * * * Q. And did you tell your folks about any of those incidents? A. No, sir. Q. Why didn't you? A. Because I was afraid to, and the shame and the disgrace of it."

The testimony of the plaintiff generally was to the effect that the act of sexual intercourse was accomplished against her will and in spite of all the resistance she could make under the circumstances, and that, although it was committed at a place where any considerable outcry would have been heard by members of the defendant's family, some of whom (three small children) were sleeping in the same room, she did not scream or cry out because she was "so scared and nervous" that she could not.

The defendant, in his own behalf, denied any sexual intercourse with the plaintiff and that he ever took any improper liberties with her, leaving her testimony otherwise uncontradicted. There was no attempt to show that the plaintiff was not of previous chaste and virtuous character, or that she ever had sexual intercourse with any other man than the defendant, or with him, except upon the occasions detailed by her in her testimony. Counsel for defendant states his first and principal contention as follows:

"The first assignment of error is that the court erred in overruling plaintiff in error's demurrer to the evidence of the defendant in error, introduced for and on behalf of the defendant in error in said cause. The court will observe that there is absolutely no testimony to show that the defendant Watson used any force or violence in accomplishing this alleged act. Nor was the plaintiff, Marietta Taylor, prevented from resisting, by

threats of immediate or great bodily harm accompanied by power of execution. The court will also observe that at the time of this alleged assault the plaintiff was a woman weighing between 135 and 140 pounds; that there is no testimony that she made any resistance whatever, or that she made any outcry. Under these circumstances, we contend that the law presumes that she consented to this unlawful act of sexual intercourse, if there was any act of sexual intercourse, and if she did consent, she cannot recover in this action."

We cannot agree with counsel. It is true that the case was submitted to the jury upon the erroneous theory that in this jurisdiction consent and resistance are necessary elements to constitute the crime of rape upon a female of previous chaste and virtuous character, over the age of sixteen years and under the age of eighteen, but granting, as contended for by counsel for the defendant, that the cause must be determined here upon the same theory (*Herbert v. Wagg et al.,* 27 Okla. 674, 117 Pac. 209), it seems to us that there was sufficient evidence adduced at the trial tending to establish resistance and nonconsent to justify the trial court in submitting the cause to the jury, and to sustain the verdict returned.

In *Kaufman v. Boismier,* 25 Okla. 252, 105 Pac. 326, it is said:

"It has been held not only by this court, but also by the Supreme Court of the territory of Oklahoma, in numerous cases, that it will not disturb the verdict of a jury upon controverted questions of fact, and it is immaterial whether such questions arise from direct or circumstantial evidence. The jury had the opportunity of seeing the witnesses on the stand face to face and observing their manner, apparent fairness and candor, or want of it. This is not available to this court in a re-examination of evidence, and, where there is any reasonable evidence tending to support the verdict, it will not be disturbed here."

If this were a criminal case, where the prosecution is bound to prove the charge beyond a reasonable doubt, it would probably be controlled by *People v. O'Sullivan,* 104 N. Y. 451, 10 N. E. 880,, and cases of that class, cited by the defendant. But here, whether the charge was established by a preponderance of the evidence largely depended upon the credit to be given to the testimony of the plaintiff, and that was a question for the jury.

The evidence shows the defendant to be a strong man, of mature years, with a large family, some of whom were grown at the time of the offense. His intimate and friendly relation with the family of the plaintiff gave him opportunities to discover that he wielded great influence over her and that on account of her youth and inexperience he could probably accomplish his evil purpose without great physical resistance. There is no evidence that the plaintiff sought the company of the defendant or threw herself in his way, or in any manner encouraged his advances, but, on the contrary, it all tends to show that he in every instance was the aggressor, and that he seized every opportunity to lay hold of her and forcibly carry her off in pursuance of his evil purpose, and that it was only after three unsucessful attempts that he finally succeeded in overcoming her uniform resistance. As was said in a similar case:

"It is not often that such an assault is or can be described by a female with that complete fullness of detail with respect to every word spoken or every fact and circumstance that may enter into the questions of consent or resistance. When the proof is given, as it sometimes is, in general terms, the jury must still be satisfied that there was no consent, and that resistance was made to the extent of the woman's ability. What that ability was must in many cases depend not only upon her strength and power to defend herself or make herself heard, but also upon the element of fear, when it exists. The age, strength, and physical appearance of the parties, with the manner in which they testify, are elements of some importance which the jury may consider with all the other facts. The relation which the parties bear to each other, as in this case, may also be considered. Where on one side we find extreme youth, inexperience, and dependence united with the principle of fear and obedience, and on the other, mature age, great physical power, and dominating influence and control over the movements and will of another, the question of consent and resistance must be determined with reference to those conditions.

"When such a case arises, who is to determine when, as in this case, the girl, in stating the occurrence, states that she did not consent and did resist to the best of her ability, whether she tells the truth or not? Can this court, after the jury have accepted the plaintiff's version of the transaction and the General Term has approved the verdict, say, as matter of law, that

there was no evidence for the consideration of the jury? This, I think, would be to transcend the limits of our jurisdiction as a court of law, without power to review disputed facts."

*Dean v. Raplee*, 145 N. Y. 319, 39 N. E. 952; *Schenk v. Dunkelow*, 70 Mich. 89, 37 N. W. 886; and *Witzka v. Moudry*, 83 Minn. 78, 85 N. W. 911, are cases of this class wherein verdicts for the plaintiffs, rendered upon similar states of fact, were upheld on appeal.

Moreover, our statute provides (section 2353, Comp. Laws 1909) that all that is required to constitute the crime of rape is an "act of sexual intercourse accomplished with a female, not the wife of the perpetrator. * * * Where the female is over the age of sixteen years and under the age of eighteen, and of previous chaste and virtuous character." The language of the statute is clear and unambiguous. It clearly eliminates the elements of consent and resistance from the case of an assault upon the class of females therein described. Its manifest purpose is to throw a protecting mantle about the female children of this state within certain ages, which the hand of the libertine may not withdraw except at his peril. The statute in effect says that chastity is such a precious gem in the crown of maidenly graces that it cannot be stolen or removed therefrom even with the consent of the wearer, without offending the majesty of the law. To prove that the female consented will not mollify the statute, neither should it avail as a defense to a civil action for damages for an assault upon her committed in such manner and under such circumstances as to constitute rape as defined by the statute. *Altman v. Eckerman*, 132 S. W. (Tex.) 523. Whilst we concede that under the authorities the case must be determined in this court upon the same theory upon which it was submitted to the jury, yet the reasons which induced the Legislature to pass the foregoing statute cannot be ignored. The statute is obviously based upon the principle that consent or nonresistance on the part of a girl of tender years is not to be understood in the same way as in the case of like acts committed upon a woman of more mature years. The jury could have taken the same view of the case. *Dean v. Raplee, supra*. It is impossible to lay down any general rule which shall define the exact line

of conduct which shall be pursued by an assaulted female under all circumstances, as the power and strength of the aggressor, and the physical and mental ability of the female to interpose resistance to the unlawful assault, and the situation of the parties, must vary in each case. What would be the proper measure of resistance in one case would be totally inapplicable to another situation accompanied by differing circumstances. One person would be paralyzed by fear and rendered voiceless and helpless by circumstances which would only inspire another with higher courage and greater strength of will to resist an assault. A young and timid girl might be easily overpowered and deprived of her virtue before she had an opportunity to recover her self-possession, and realize her situation, and the necessity of the exercise of the utmost physical resistance in order to preserve her virtue. It would be unreasonable to require the same measure of resistance from such a person that would be expected from an older and more experienced woman, who was familiar with the springs and motives of human action, and acquainted with the means necessary to be used to protect her person from violence.

It is next contended that it was error for the trial court to permit a child two and one-half years old, alleged to be the fruit of the unlawful intercourse, to be exhibited to the jury over the objection of the defendant. The decisions in the various jurisdictions seem to be divided on this question. They are all collected in notes to *State v. Danforth,* 6 A. & E. Ann. Cas. 557, and *Rex. v. Hughes,* 19 A. & E. Ann. Cas. 534. In the Danforth case, decided by the Supreme Court of New Hampshire (73 N. H. 215, 60 Atl. 839), it was held:

"That in a prosecution for statutory rape, the child born to the prosecuting witness may be exhibited by the state to the jury for the purpose of establishing the facts of birth, and of prior unlawful intercourse."

The annotator says that the reported case is in accord with the preponderance of authority, which holds that where the putative father is in court and within the view of the jury, it is not improper to produce the child before the jury and to call attention to points of resemblance or difference between the two.

A more extended citation of the authorities will serve no useful purpose. It will suffice to say that, after a careful examination of all the cases called to our attention, we have reached the conclusion approved by Mr. Wigmore (1 Wig. Ev. sec. 166), that:

"The sound. rule is to admit the facts of similarity of specific traits, however presented, provided the child is, in the opinion of the trial court, old enough to possess settled features or other corporal indications."

The other assignments of error relate to the pleadings and proceedings had below, and these we are required to disregard, unless they affect the substantial rights of the adverse party. Section 5680, Comp. Laws 1909. We have examined the record with considerable care, and cannot say that the errors complained of, if errors at all, injuriously affected any substantial right of the defendant. The court below submitted the case to the jury upon a theory which, according to our mind, cast an unnecessary burden upon the plaintiff, which she sustained to the satisfaction of the jury. The court below in examining the record, upon motion for new trial, was satisfied with the verdict, and that the defendant had a fair trial according to the forms of law, and, as we also are of that opinion, the judgment of the court below ought to be affirmed. It is so ordered.

HAYES, C. J., and WILLIAMS and TURNER, JJ., concur; DUNN, J., dissents.

----

DUNN, J. (dissenting). In the conclusion reached by the court in this case I am unable to concur. The chief question raised and argued on this petition for rehearing is that there is no evidence in the record supporting the instructions on the ground of rape by force and violence, and in this contention I am constrained to concur. The instructions which were given by the court were unexcepted to. Hence they are the law of the case, and, right or wrong, the proof must measure thereto, or the verdict will be without adequate support. *Myers v. Fear et al.*, 21 Okla. 498, 96 Pac. 642; *Irwin et al. v. Thompson et al.*,

27 Kan. 643; *Lynch v. Snead Architectural Iron Works,* 132 Ky. 241, 116 S. W. 693; *Emerson v. County of Santa Clara,* 40 Cal. 543; *Sullivan v. Otis,* 39 Iowa, 328.

In the case of *Myers v. Fear et al., supra,* Justice Kane, who prepared the opinion for the court, says:

"It is a well-settled rule that, when the verdict of the jury is contrary to the instructions of the court, it should be set aside."

The Supreme Court of Kansas, in the case of *Irwin et al. v. Thompson et al., supra,* in the syllabus says:

"Where a case is tried by a jury and the court gives them instructions, such instructions, if unquestioned and not excepted to, becomes the law of the case; and if the jury in their verdict plainly disregard such instructions, it is the duty of the trial court in the first instance, and of this court on review, to set aside such verdict and grant a new trial."

The Court of Appeals of Kentucky, in the case of *Lynch v. Snead Architectural Iron Works, supra,* in the syllabus says:

"A verdict is contrary to law  *  *  *  when it is contrary to the instructions, whether they are right or wrong."

The Supreme Court of California, in the case of *Emerson v. County of Santa Clara, supra,* in the syllabus says:

"A verdict of a jury, in disobedience to the instructions of the court, although the instruction itself was not correct in point of law, is a verdict 'against law,' under subdivision 6, sec. 193, Practice Act."

The plaintiff, in her petition, alleged that on January 14, 1906, she was a minor, aged seventeen years, and that the defendant on the night of that day made an assault and committed upon her by force and violence the crime of rape; that as a result thereof, on the —— day of October, 1906, she was delivered of a bastard child. Under the laws of this state, a woman of the age of seventeen years may consent to sexual intercourse, unless she is of previous chaste and virtuous character, and it is rape where she consents only when these conditions exist. Plaintiff in this case chose not to rely upon her previous chaste and virtuous character, but insists that defendant was guilty of rape because he had carnal intercourse with her against her will and by force and violence. At the conclusion of the evidence, the court instructed the jury as follows:

"If you find from the evidence that the defendant H. F. Watson unlawfully and willfully accomplished the act of sexual intercourse with the plaintiff herein,- Marietta Taylor, and that said Watson accomplished the said act of sexual intercourse by force and violence against her will, and that her resistance was overcome by force and violence, then you should find for the plaintiff. Without force, actual or constructive, there can be no rape. To constitute the crime of rape the testimony must show that the plaintiff resisted the alleged assault of the defendant to the utmost of her capacity and extent of her ability, except as hereinafter stated, and if you find from the evidence that the plaintiff submitted to the embraces of the defendant, while she had the power to resist, however reluctantly she may have yielded, such submission deprives the act of an essential element of rape. You are further instructed that should you find from the evidence that the plaintiff herein was prevented from making resistance by threats of immediate and great bodily harm, accompanied by power of apparent execution on the part of the defendant, that this would be equivalent to constructive resistance and would excuse the plaintiff from making actual or forcible resistance to the alleged assault of the defendant; and if raped under these circumstances, the crime or rape would be accomplished notwithstanding her failure to make physical resistance to the alleged attack or assault of the defendant. You are further instructed that if the carnal connection complained of by the plaintiff did not in fact take place against the consent of the plaintiff, she cannot recover in this action."

Herein, then, on the challenge of the plaintiff is laid down the specific rules and law under which this cause must be decided. The intercourse, it is provided, must be by force and violence against her will, and that her utmost resistance was overcome by such force and violence. That if she yielded to the defendant while she had the power to resist, no matter how reluctantly, the offense with which he was charged was not consummated, except there was present threats of immediate and great bodily harm, accompanied by the power of execution. To these heights must the evidence in this case rise, or the verdict rendered by the jury is without support. If there is any evidence in the case which, allowing for it all reasonable deductions to which it is entitled, and all logical conclusions which may be drawn from it, will support the verdict, then it must

stand. If on the other hand, after the case is stripped of all the evidence of the defendant, who denied *in toto* the charge made, and every inference against the evidence of the plaintiff, there is still lacking evidence sufficient to support the verdict, it must fall. To this test I am willing to subject the uncontradicted evidence given by the plaintiff and to assert that the record is totally devoid of any testimony which any reasonable, rational man ought to say meets the demand set forth in the petition of plaintiff and the instructions of the court. That evidence upon which she must rely discloses that she was a daughter of a neighbor of the defendant, one among several children; that she was seventeen years of age, weighed between 135 and 140 pounds, and on the night of the alleged offense, accompanied the defendant and his family to his home, where she was to remain all night. The questions and answers of the plaintiff are then as follows:

"Q. Did you want to go over with him that night? A. I don't know as I did, but I didn't want them to think it strange of me not going. Q. But you did testify at the preliminary hearing that you wanted to go that night? A. Yes, sir; but I went to keep the folks from mistrusting. . Q. You did testify in the preliminary hearing that both wanted to go, so pa held straws so you and sister could draw to see which one would go—that is the way you testified at the preliminary hearing? A. Yes, sir. Q. Now, going over to the house, who went with you over to the house? A. To their house? Q. Yes. A. Mr. Watson and two of the girls and he. Q. Mrs. Watson and— A. Him and the two little girls. Q. How did you go over? A. In the wagon, on a piece of a load of hay. Q. On the wagon, on a piece of load of hay. Where did you all sit? A. Up on top of the hay. Q. Now, that night when you came back from the box supper at Mustang, where did you all sit in the wagon? A. We sat down in the wagon, the best I remember now. Q. I mean on the way home from the box supper? A. We sat down in the wagon, the best I remember now. Q. Who sat on the seat? A. I don't remember; I believe I did. Q. Who sat with him? A. I guess I did; I sat on the seat with him. Q. Who all was at Watson's house that night? A. The night of the 14th? Q. Yes, the 14th of February, or January you now say it is, who was it was there that night? A. His wife and two little girls and him. Q. His wife and two little girls and him? Where did he and his wife sleep? A. In the other bedroom. Q. And where did you

and the little girls sleep? A. In the other bedroom. Q. Two adjoining bedrooms? A. Yes, sir. Q. Then the little girl slept with you? A. Yes, sir. Q. When you went in you latched the door? A. Yes, sir. Q. Why did you do that. A. Because I thought maybe he might come in, and I latched the door. Q. Is that the reason you latched the door? A. Yes, sir; the best I know now. Q. What did he do? A. He pulled up the covers and I turned over on my stomach as he got into bed. Q. He pulled up the covers, you turned on your stomach, and he got in bed? A. Yes, sir. Q. Then what? A. He turned me over. Q. The girl was sleeping beside you in bed? A. Yes, sir. Q. The little girl five years old, or four or five? A. I don't know how old; I wasn't there when she was born; I don't know a thing about it. Q. You have testified she was four or five? A. I won't say sure how old she was. Q. That was your judgment? A. Yes, sir; but I was guessing at it then; I don't know anything about it. Q. But the little girl you have been testifying was four or five years old was in the bed beside you? A. Yes, sir; she might have been younger; I don't know. Q. Mrs. Watson was in the adjoining room? A. Yes, sir. Q. Make any outcry when he crawled in bed with you? A. No, sir; because I was afraid to. Q. He hadn't done anything the other time when in bed with you? A. No, sir. Q. Why were you afraid? A. Because he told me I had better not tell it. Q. Then he got in bed; what did he do then after he got in bed? A. He had sexual intercourse. Q. Tell the jury what he did; what was you doing? A. That is the best I know how to tell it. Q. Well, you were laying on your back when he came in? A. Yes, sir. Q. When he come in you turned over on your stomach? A. Yes, sir. Q. Then he got in bed with you? A. Yes, sir. Q. What did he do? A. I told you once; I don't know how to tell it any different. Q. You were lying on your stomach? A. Yes, sir; I told you he turned me over. Q. That was the first thing he did? A. Yes, sir. Q. And he had sexual intercourse with you? A. Yes, sir. Q. Was that with or without your consent? A. I was scared and nervous, and I told him to go on out and let me alone, and he said he bet his farm or give his farm, I don't know which. Q. That it would not hurt you? A. That it would not hurt me. Q. He said that too? Well, how long did he stay in bed with you then? A. About a half hour, I guess, to the best I know. Q. Mrs. Watson was in the adjoining room; you didn't cry out? A. No, sir. Q. You knew if you did she would hear you? A. I was afraid to; I was scared and nervous. Q. That is what you said, you knew Mrs. Watson was in the adjoining bedroom,

and you knew if you did she would hear you? A. I was afraid to. Q. You knew she would hear you? A. Yes, sir; but how did I know what he might do, he might, oh, what he might cut my throat, or no telling what; I didn't know what he might do. Q. He hadn't cut your throat before that time? A. No, sir; but I didn't know whether he would or not. Q. Is that the reason you didn't cry out? A. I was afraid to; I told you that. Q. How long was he in bed with you? A. I don't know; he was gone out I judge a half hour, probably a half hour. Q. How long was he in bed with you? A. I said it might have been a half hour, or shorter, I don't know. Q. Somewhere about a half hour he stayed in bed with you? A. I think so. Q. What did you do all that time? A. I told you once. Q. Had sexual intercourse for a half hour? A. Yes, sir. Q. How much of a struggle took place in that bed? A. I don't remember now. Q. And he turned you over on your back. Did he have to take hold of your limbs to pull them apart? A. I don't remember now whether he did or not. Q. Now to get this altogether straight, what was the first thing he said to you when he came in the room? You said in the first place to go out; then what did he say? A. He said no, it would not hurt me or amount to anything. Q. Did he say that before you said anything about it hurting? He said no; what did you say? A. I don't remember just word for word. Q. You told it before? A. I seen him standing there and I told him to go on out. He said no and commenced hauling at the covers and said it would not hurt me, he would bet his farm or give his farm. Q. Then what? A. I said yes, sir, I thought it would, and he said not. Q. Then what? A. I do not remember. Q. He said it would not hurt you; you said yes, you were afraid it would; and he said no, it would not, that he would bet his farm it would not; and you said yes it would—is that correct? A. Yes, sir. Q. Did it hurt? A. Yes, sir. Q. Then he was in bed with you about half an hour? When he left he went out the door; do you know where he went? A. No, sir; he went out the door. Q. And he came back again? A. Yes, sir. Q. Came back through the door the next time? A. Yes, sir. Q. Then got in bed with you again? Dressed the same as he was before? A. Yes, sir. Q. When he came back in he came in through the door? How do you know he came in through the door? A. Because I seen him. Q. Was you awake or asleep? A. I know he came in that way. Q. You say you saw him? A. Yes, sir. Q. Were you awake or asleep? A. I was dozing. Q. You were dozing? A. Yes, sir. Q. If you were dozing how did you see him come through the door? A.

Because I opened my eyes and seen him. Q. Did you doze off to sleep, did you go to sleep after he was there the first time? A. I was just dozing off. Q. You were just dozing off? A. Yes, sir. Q. Didn't you testify at the preliminary hearing that you dozed off to sleep? A. Yes, sir; but I might have been mistaken. Q. What do you say now? A. I dozed off to sleep. Q. Oh, you dozed off to sleep? A. Yes, sir. Q. You dozed off to sleep, and yet you say you saw him come in through the door? A. Yes, sir. Q. Then he came to your bedside and you told him to go away; he said no; you said yes; he said no, he said it would not hurt you; you said it would, and then what did he say after that? A. He said no, he knew it would not, and he said I had better not tell any of it at all. Q. Then he said you had better not tell it? A. Yes, sir. Q. Why did he say that? A. I don't know anything about it. Q. Had you said anything about telling it? A. No, sir; but he told me that all the time. Q. He got in bed with you the second time? A. Yes, sir. Q. Was you lying on your back that time? A. I don't remember; yes, sir, I believe so. Q. You turned over on your stomach again? A. No, sir. Q. You didn't the second time? A. No, sir; because I was scared and nervous. Q. How long were you discussing the question the first time of whether or not it would hurt you? A. I don't know how long it was. Q. You were too scared to discuss that? A. I just woke up and I was scared of course. Q. Did you get up and lock the door after he was in there the first time? A. No, sir. Q. Why didn't you? A. I don't know. I didn't do it. I didn't lock the door. Q. How long did he stay in bed with you the second time? A. About the same time. Q. About a half hour? A. About the same time. Q. About a half hour? What did he do in bed with you about a half hour? A. Did the same as he did the other time. Q. Sexual intercourse for half an hour again? A. Yes, sir. Q. How many times did he have sexual intercourse with you that night? A. Twice. Q. And half an hour each time; that is true, is it? A. Yes, sir. Q. Well, after he went out the second time, did you get up and lock the door? A. No, sir. Q. Mrs. Watson was sleeping in this next room all the time? A. Yes, sir. O. And the little girl slept beside you in the bed? A. Yes, sir. Q. That is the first time he had ever had sexual intercourse with you, you are absolutely positive of that? A. Yes, sir; I am. Q. Was that the last time? A. Yes, sir. Q. What time did you get up in the morning? A. Pretty early; yes, Mr. Morgan and his brother came over there to load the potatoes early. Q. That he had gotten of Mr. Watson? A. Yes, sir. Q. Now, was the

bed stained the next morning. A. No, sir; not that I noticed. No, sir; it wasn't. Q. Was any of your night clothes stained in any way? A. Not that I remember of now. Q. No hemorrhage or bleeding of any kind? Q. Did you answer the question? A. Yes, sir. Q. What did you say? A. I said no. Q. That was the first time any man ever had sexual intercourse with you? A. Yes; sir. Q. Now, after this occurrence when was the next time you were over at Watson's? A. After the 14th? Q. Yes. A. I don't remember. Q. You don't remember when you were over there after that? A. I might have been one or two times. Q. You went to an entertainment at Red Hill schoolhouse with the Watsons? A. Yes, sir; and ma and sister went with us. Q. You rode in the wagon with the Watson family just the same as going to the supper? A. We all rode in the wagon. Q. When was the first time you ever told anybody about this? A. The 30th of August. Q. The 30th of August, 1906; you say this last time occurred on the 14th of January, and you never told anybody about it until the 30th of August? A. Yes, sir. Q. You had been pregnant about seven months about that time, hadn't you? A. I guess so. Q. It was so that it was quite perceptible, wasn't it? A. Yes, sir. Q. And it got to where you could not conceal it any longer and you told your mother about it? A. She asked me, and I told her. Q. Did you ever tell Watson anything about it—that you were in a family way? A. No, sir; I never did. Q. That you were in a family way, until you filed the action? A. No, sir."

To my mind the mere reading of the foregoing recital is sufficient and ought to convince any reasonable man that there was absolutely no conduct took place in the bed with the plaintiff that night which would constitute her forcible and violent ravishment. When asked as to how much of a struggle took place in the bed, she stated merely, "I do not remember." And when asked as to whether or not defendant took hold of her limbs to pull them apart, she again stated, "I do not remember." Yet her duty is to resist to her utmost, and the burden of proving this is upon her. And when interrogated on the very essential proposition involved in this case as to whether or not the act was committed with her consent, she did not answer it but evaded the question and said, as is seen above, "I was scared and nervous and told him to go on out and let me alone," and then manifestly consented.

It is her duty to resist; the act of rape, under her petition and the instructions of the court, could not be consummated except by the defendant overcoming her resistance. No resistance, no rape. Resistance means to fight back, not to quietly and submissively yield; or, as is said by Ryan, C. J., in *State v. Welch,* 37 Wis. 196, "resistance is opposing force to force, not retreating from force." And not only must the resistance be made, but it must be made to the utmost of her capacity, for the court's instruction was that if the "plaintiff submitted to the embraces of the defendant, while she had the power to resist, however reluctantly she may have yielded, such submission deprives the act of an essential element of rape." "Utmost" is defined by Webster to be: "The most possible; the farthest limit; the greatest power, degree, or effort." The plaintiff pleaded in her petition that by force and violence she was ravished, went into the trial of the case upon that issue, and then testified to facts which demonstrate to my mind beyond any reasonable doubt that there was no force and violence whatsoever used, or, if so, that she made absolutely no resistance.

I have examined a great number of cases involving the same question as here, and I have yet to find a report of any case with facts even approaching those shown by this record being sustained by any court as constiting the crime of rape. As I view it, the record is totally and absolutely devoid of any evidence whatsoever of force, violence, or resistance.

The definition of the word "force," according to Webster, is as follows:

"Power, violence, compulsion, or constraint exerted upon a person or thing; strength or power, of any degree, exercised without law, or contrary to law, upon persons or things; violence."

"Violence" is defined by Webster as follows:

"Strength or energy actively displayed or exerted; vehement or forcible action; force; impetuosity; vehemence; of persons, vehement or unrestrained eagerness; highly excited or animated force or energy."

It is a misnomer, it is a misapplication of those terms, it is a violation of the fundamental, common, ordinary meaning the English-speaking people apply to those words, for a court to say

that that which plaintiff in this case says took place constituted ravishment by force and violence. No reliance whatever is made upon any threats having been made by the defendant against the plaintiff, so that she was in no wise intimidated. All she says defendant said to her is set out above, and of course does not show any threat. The evidence in this case not only contains no support for the claim, but it affirmatively shows that none existed. Necessarily one would assume, if a female is forcibly ravished, her virtue stolen, and left in the mental condition that a decent female would be under those circumstances, that rest and sleep would be out of the question for at least the balance of that night. The ravisher would have murdered innocent sleep and left her distraught and wrought to the point of distraction. But not so in the present case. This woman, of more than ordinary strength, size, and weight, says she peacefully dozed off to sleep after having been subjected to thirty minutes of forcible ravishment, and when her despoiler once more appeared at her bedside to repeat it, instead of screaming, fleeing, or fighting, she calmly and quietly told him to go away. And then once more admitted him to her bed, and again permitted herself to be forcibly ravished for another half hour, and the little child which slumbered by her side, and the other children in the same room, and the wife in the adjoining room, were undisturbed by her efforts to protect her virginity. The bed was not stained, nor apparently disarranged, nor were her clothes stained in any way, nor did the ferocity of the attack result in any hemorrhage whatsoever; nor did either of them bear any marks of the combat. She arose the next morning, commingled with the plaintiff and his family, and her appearance apparently excited no comment on their part; nor did she complain to his wife, children, associates, or anyone else of all the world until seven months later, when on the 30th of August, beginning to show signs of pregnancy, for the first time she told her mother. I challenge the annals of jurisprudence to supply another case of similar character, or one where the facts even approach those admitted in the case at bar, where a judgment civil or criminal has been sustained. The undisputed facts exist and a righteous judgment stand. It shipwrecks logic, rea-

son, and law to permit a judgment of this character on this evidence to be affiirmed. I do not place this dissent upon precedent or authority, for I deem that I need not; but there are cases by the score where the facts are stronger than these, and appellate courts have done that which in every case they should do when there is no evidence to support a verdict—declined to affirm it. Nearly all cases of rape are criminal in their character. The evidence of the force, violence, and resistance must be established to the satisfaction of the jury beyond a reasonable doubt; but after it is established beyond a reasonable doubt, it is no more nor less than the evidence of force and resistance.. Hence, the grade of proof required in no wise touches the question in this case; while they are too unreasonable for me to give them any credence whatever, the things to which this woman testifies are assumed to be absolutely established not only beyond a reasonable doubt, but beyond every doubt—they are assumed to be simply true, and the position I take is that, being so established, there is no evidence of rape.

The facts in the case of *State v. Cowing*, 99 Minn. 123, 108 N. W. 851, 9 Am. & Eng. Ann. Cas. 566, disclose the following:

"He was a farmer, forty-nine years of age, and had a family of seven children, including his oldest son, twenty-two years of age. He was never before accused of any crime, and had lived continuously for many years on a farm adjoining the farm of the father of the complaining witness. The houses were about three-quarters of a mile apart. Apart from some trouble with rheumatism, the defendant was a man of at least ordinary strength and weighed about one hundred sixty-five pounds. The complaining witness was unmarried, twenty-three years of age, had done the usual work of a girl on the farm, was about five feet tall, and weighed about one hundred pounds. The testimony, read in the light of the trial court's memorandum, tended to show, but not satisfactorily, that she had not the average mental endowment, nor ordinary physical strength, and that she had suffered from continued ill health. The complainant's version is that when she was in the kitchen defendant came in softly 'and grabbed me with my arms tight back of me and said, "Lizzie, we are going to have some fun." I said, "No, I don't want no fun," dragging me. After I said I didn't want any fun, he grabbed me with both arms again. When he grabbed me the

first time I was standing by the stove with my back toward the door. When he grabbed me the second time I was standing the same way. Then he jerked me around, my face to the east and my arms back of me, and grabbed me tight, dragging me out of the kitchen in through the door into the front room south of the kitchen. While he was dragging me I tried to fight and get away as hard as I could, and screamed and hollered as loud as I could. I said for him to leave me alone, let go of me, but he dragged me in farther and throwed me on the couch with my arms under me and throwed me on my hands. I don't know how large the couch is. Then he kicked his left knee below my chest and pressed me down, and grabbed with his left hand into my throat and choked me as hard as he could, and with his right hand he rushed up my clothes so quick, and then he· had sexual intercourse with me. It caused me to flow blood all over my skirt. I see him when he got off me. There was blood on his right hand, across his fingers, and across the whole length of his hand. This intercourse caused me pain. My throat was sore, ·and I was lame all over. It caused me pain when he was doing this. My head ached. It hurt me at the time he was doing this hard, just as though some one was running a knife through me and tearing me all to pieces. I did not in any manner consent to that intercourse. I was not willing that he should have it with me. I tried just as hard as I could to get away. After he did this he went right off. When he got off my person he rushed his clothes right up quick with both hands and then went right out.' "

Discussing these facts, the court said:

"The principal question presented by the record concerns the sufficiency of the testimony of the prosecutrix to show the degree of resistance to the assault charged which the law requires. That degree, in the nature of things difficult of determination, has been the subject of much legal controversy. * * * In the case at bar there is no lack of testimony to the conclusion that the prosecutrix did not consent, but there is little other evidence in this regard. She says she tried to fight and get away just as hard as she could while he was dragging her, but there is no specific act of resistance testified to after she was carried to the couch. She does not say that she employed the instinctive devices of self-defense; for example, she does not say that she crossed her legs or tried to keep them together. There is no evidence that she used the natural means of offense. While the defendant's left knee was below her chest and he was pressing her down and held her throat with his right hand, as she testi-

fies, it might well be that she could not have taken her arms out from under her body; but· it is unexplained why she did not free one arm at least when he was in the position he must afterwards have assumed to. have accomplished his purpose. Not only is she not shown to have used or tried to use her hands, but there is no testimony that she used or tried to use her body, legs, or any other ordinary means of reprisal. Neither the victim nor the perpetrator appear to have borne any bruise or mark resulting from the struggle. There is confused testimony that one of her skirts was slightly torn; but no evidence that her clothing had been touched or torn. Nor does the record show any threats or intimidation on the part of the defendant, or any intent on his part to use any means necessary to accomplish his purpose, nor any reasonable ground for apprehension of bodily harm, nor such a place or position of the prosecutrix as would have rendered resistance useless. It would seem that the only theory upon which her testimony is sufficient to show resistance is that ordinary means of self-defense were precluded by her mental condition. The record does not show her collapse or unconsciousness. The only evidence on this point is in her cross-examination. She was asked whether she had not testified on the preliminary examination to a series of statements, including at the end the following: ' "And pretty soon he threw up my clothes in a rush. My mind was gone so that I didn't know what he was doing. So pretty soon he got his privities into me as hard as he could, and mauled it around as hard as he could." "Did you so testify?" She answered that she "did not testify that way the first time. Not the last part, I didn't." ' The reporter who took the minutes of the testimony on the examination before the magistrate swore that she did so testify. Moreover, her own testimony on trial, previously referred to, was not consistent with the denial. For present purpose it is proper to consider this testimony most favorably to the prosecutrix; but, in allowing the testimony as to her mental condition to remain, it is to be borne in mind that there exist contradictions as to her statement of her own analytical consciousness at the time of the act. Her testimony reveals a clear memory and close observation as to what happened immediately before and immediately after the act complained of. She heard him tear her skirt, which, in the trial, she said did not tear very easily, and as to which, on the preliminary examination, she testified: 'It tears very easy.' The tear did not make very loud noise, but she heard it tear. 'I don't mean his little· finger.' She had previously testified that her hearing was reasonably good. After the act she said 'there was

blood on his right hand, across his fingers, and across the whole length of his hand.' Immediately afterwards she testified that the accused left. She then saw cows break out and came up towards the house where there was a line of fancy clothes, and she didn't want them to chew them, so she went out as far as the porch and set the dog on them; but she didn't run, she 'just wiggled out that far.' This testimony·tends to corroborate that of the defendant as to the same incident. Taking the testimony as a whole it creates more than a grave doubt whether either resistance or a state of mind excusing the failure to resist was shown. It is apparent that upon a new trial the testimony of the prosecutrix could be made more definite as to the specific acts of resistance and as to the condition of her will at the time of the alleged outrage. The proof as to her mental and physical condition at that time, now inadequate and leaving much to conjecture, is susceptible of being properly made more certain. See *State v. Peterson*, 110 Iowa, 647, 82 N. W. 329. It must occur that the circumstances of outrages such as this is alleged to have been are not so nearly identical that a decision on one state of facts can be regarded as determining another controversy. We are especially referred to *Spaulding v. State*, 81 Neb. 289, 85 N. W. 80, and *Baer v. State*, 52 Neb. 655, 81 N. W. 656, as containing judicial sanction of a conviction upon the facts similar to those at bar. In the case first named, the court, commenting on the absence of resistance as would usually be expected, sets forth, among other things, that the prosecutrix struck the defendant, leaving a mark on him visible for some time thereafter, that he admitted receiving a blow from her, and that her testimony as to becoming unconscious was in a degree corroborated by other witnesses. In the last named case, the prosecutrix testified that in the struggle she was dragged around the floor several times, despite her most agonizing appeals' to the defendant and to God. She was scratched, bruised, and her clothes torn, and made complaint immediately. There was also evidence of intimidation and of threats to kill."

See, also, *Livinghouse v. State* (76 Neb. 491) 107 N. W. 854.

To the same effect is the early case from the Supreme Court of Nebraska, *Oleson v. State*, 11 Neb. 275, 9 N. W. 39, wherein Chief Justice Maxwell, who prepared the opinion, quoted approvingly from the following authorities, as follows:

"In the case of *People v. Morrison*, 1 Parker Cr. Rep. 625, it is said, to constitute the crime there must be unlawful and

carnal knowledge of a woman by force, and against her will. * * * The prosecutrix, if she was the weaker party, was bound to resist to the utmost. Nature had given her hands and feet with which she could kick and strike, teeth to bite, and a voice to cry out; all these should have been put in requisition in defense of her chastity. In *The People v. Behring*, 69 N. Y. 374, it is held that 'in order to constitute the crime of rape of a female over ten years of age, when it appears that at the time of the alleged offense she was conscious, had the possession of her natural mental and physical powers, was not overcome by numbers or terrified by threats, or in such place or position that resistance would have been useless, it must also be made to appear that she did resist to the extent of her ability at the time, and under the circumstances.' In the case of *People v. Benson*, 6 Cal. 221, it is said: 'That there was no outcry, though aid was at hand, and the prosecutrix knew it; that there was no immediate disclosure; that there was no indication of violence on her person, and that the act was committed at a time and under circumstances calculated to raise a doubt as to the employment of force, are put as strong circumstances of defense, not as conclusive, but as throwing a doubt upon the assumption that there was a real absence of assault.' In *Whitney v. The State*, 35 Ind. 506, the court say: 'In prosecutions for this crime the best judges of ancient and modern times have laid down certain tests by which to be governed in ascertaining the truthfulness of the party preferring the charge. They concur in saying that her evidence should be carefully considered; and if the witness be of good character; if she presently discovered the offense, and made search for the offender; if the party accused fled for it; these and the like are concurring circumstances which will give greater probability to her evidence. But on the other hand, if she be of evil fame, and stand unsupported by the testimony of others; if she concealed the injury for any considerable time after she had an opportunity to complain; if the place where the act was alleged to have been committed were such that it was possible she might have been heard, and she made no outcry; these and the like circumstances carry a strong but not conclusive presumption that her testimony is false or feigned.'"

In the case of *Brown v. State*, 127 Wis. 193, 106 N. W. 536, 7 Am. & Eng. Ann. Cas. 258, the facts are stated as follows:

"The information alleged that 'on the 27th day of October, in the year 1904, at said county, Grant Brown did ravish and carnally know one Edna Nethery, a female of the age of fourteen years and more, by force and against her will and against the

peace and dignity of the state of Wisconsin.' The two parties
were children of neighboring farmers who had known each other
all their lives. The accused was twenty years old, the prosecu-
trix sixteen. Within the year before the event they had been
thrown to some extent in company at social gatherings, at one
of which at least had occurred direct personal contact in some
games described as involving 'kissing forfeits.' On October 29,
the prosecutrix went by a usual path across fields to her grand-
mother's house for the purpose of having an aunt try on certain
clothing being made for her. Such path passed by and over parts
of the farm of defendant's father. Defendant was in the field
driving out hogs and repairing a fence, and, as prosecutrix
reached a stile, he was close thereto, so engaged. She addressed
him in a playful way with reference to his work, and he sus-
pended the same and came up to her. Her story is that he at
once seized her, tripped her to the ground, placed himself in
front and over her, unbuttoned her underclothing, then his own
clothing, and had intercourse with her; that the only thing she
said was to request him to let her go, and, throughout the de-
scription of the event, her only statement with reference to her
own conduct was, repeatedly: 'I tried as hard as I could to
get away. I was trying all the time to get away just as hard as
I could. I was trying to get up; I pulled at the grass; I screamed
as hard as I could, and he told me to shut up, and I didn't and
then he held his hand on my mouth until I was almost strangled.'
Also that at one time she got hold of the fence to try to pull her-
self away. Whenever he removed his hand from her mouth she
repeated her screams. She denies any recollection as to the posi-
tion of her limbs at any of these times, or where his were with
reference to herself. She confined her statement of the force
used by him to the actual sexual penetration. She makes no
mention of any use of her hands or her lower limbs. After the
completion of the intercourse she says he made her promise not
to tell, and, upon her doing so, allowed her to arise. She says
she made the promise because she was afraid of him, and did
not know what he would do if she did not. Thereupon she pro-
ceeded to her grandmother's house, something more than a quar-
ter of a mile, but, before entering the house, went into a shed,
slightly off her direct course, to arrange her underclothing. There
she discovered flow of blood, and, as she states, became frightened
and rushed into the house of her aunt, where she at once ex-
claimed: 'Grant Brown has (done something) to me. O! What
shall I do?' Whereupon the aunt immediately took her home
and informed her mother. She was taken to the family physi-

cian for examination, who, however, postponed it until the next day, when, in company with another physician, a physical examination was made, disclosing fresh rupture of the hymen and a condition of the genital parts indicating recent sexual intercourse, but not significant as to whether the same had been accomplished forcibly or otherwise. Her person nowhere showed any bruises or injuries, nor did her clothing, except for a rip about an inch long in her drawers. At this examination she stated to one of the physicians that she had not resisted or made any fight. The defendant's story differed only in some details and in the denial of any resistance, asserting that when she came where he was at work and addressed certain playful remarks to him he approached her, placed his arm about her and indulged in certain liberties with her person, to which she offered no resistance, whereupon he laid her down and had intercourse with her, she at no time making any resistance or outcry. There were no marks upon his face, hands or clothing of any struggle. Accused (*sic*) was a well-matured girl for her years, weighing 117 pounds. About a week before the event she had been ill with measles for four or five days, and made some suggestion that she had not fully recovered her strength on October 29th. Defendant's physical characteristics are shown only to the extent that he weighed 150 pounds, and had been brought up on a farm doing farm work."

Discussing the case, the court said:

"Not only must there be entire absence of mental consent or assent, but there must be the most vehement exercise of every physical means or faculty within the woman's power to resist the penetration of her person, and this must be shown to persist until the offense is consummated. We need not mention the exception where the power of resistance is overcome by unconsciousness, threats, or exhaustion, for, in this case, there is no proof of any of those things. Further, it is settled in this state that no mere general statements of the prosecutrix involving her conclusions, that she did her utmost and the like, will suffice to establish this essential fact, but she must relate the very acts done, in order that the jury and the court may judge whether any were omitted. *Bohlmann v. State,* 98 Wis. 617, 74 N. W. 343; *Devoy v. State,* 122 Wis. 148, 29 N. W. 455. Turning to the testimony of prosecutrix, we find it limited to the general statement, often repeated, that she tried as hard as she could to get away. Except for one demand, when first seized, to 'let me go,' and inarticulate screams, she mentions no verbal protests. While we would reasonably recognize the limitations resting on many people in attempting expression and description, we can-

not conceive it possible that one whose mind and exertions had, during an encounter of this sort, been set on resistance, could or would in narrative mention nothing but escape or withdrawal. A woman's means of protection are not limited to that, but she is equipped to interpose most effective obstacles by means of hands and limbs and pelvic muscles. Indeed, medical writers insist that these obstacles are practically insuperable in absence of more than the usual relative disproportion of age and strength between man and woman, though no such impossibility is recognized as a rule of law. 3 Wharton & S. Med. Jur. secs. 172, 188, and authorities cited; 1 Beck, Med. Jur. 203. In addition to the interposition of such obstacles is the ability and tendency of reprisal, of counter physical attack. It is hardly within the range of reason that a man should come out of so desperate an encounter as the determined normal woman would make necessary, without signs thereof upon his face, hands, or clothing. Yet this prosecutrix, of at least fair intelligence, education, and ability of expression, in her narrative mentions no single act of resistance or reprisal. It is inconceivable that such efforts should have been forgotten if they were made, or should fail of prominence in her narrative. The distinction between escape and resistance is admirably discussed by Ryan, C. J., in *State v. Welch*, 37 Wis. 196, 201. Resistance is opposing force to force .(Bouvier), not retreating from force. These illustrations but serve to point the radical difference between the mental conception of resistance and escape and emphasize the improbability that if the former existed only the latter would have been mentioned. This court does not hold, with some, that, as matter of law, rape cannot be established by the uncorroborated testimony of the sufferer, but, in common with all courts, recognizes that, without such corroboration, her testimony must be most clear and convincing. Among the corroborating circumstances almost universally present in cases of actual rape are the signs and marks of the struggle upon the clothing and persons of the participants, and the complaint by the sufferer at the earliest opportunity. In the present case the former is absolutely wanting, for the one-inch rip in prosecutrix's underwear was not shown to be of a character or location significant of force or violence. Not a bruise or scratch on either was proved, and none exist on prosecutrix, for she was carefully examined by physicians. Her outer clothing not only presented no tearing, but no disarray, so far as the testimony goes. When one pauses to reflect upon the terrific resistance which the determined woman should make, such a situation is well-nigh incredible. The significance of the other corrobora-

tive circumstance, that of immediate disclosure, is much weakened in this case by the fact that prosecutrix turned from her way to friends and succor to arrange her underclothing and there discovered a condition making silence impossible. Such facts cannot but suggest a doubt whether her encounter would ever have been disclosed had not the discovery of blood aroused her fear that she was injured and must seek medical aid, or at least that she could not conceal from her family what had taken place. Nor is this thoughtfulness of the disarrangement of her clothing consistent with the outraged woman's terror-stricken flight to friends to give the alarm and seek aid which is to be expected. We are convinced that there was no evidence of the resistance which is essential to the crime of rape, and that the motion for new trial should have been granted on that ground."

In the case of *Price v. State*, 36 Tex. Crim. App. 143, 37 S. W. 743, from the Court of Criminal Appeals, the prosecutrix detailed the facts as follows:

" 'When we had gone into the Tatum pasture, and gotten about a mile or a mile and a half of my father's house, the defendant caught my horse by the bridle, and said: "We want to stop here." He got off of his horse on the left side, and caught hold of me, and pulled me off on the left side of my horse. He was riding on the right side of the road, and I on the left, going north. When he pulled me off my horse, while I was begging and crying, he pulled out a pistol, and said for me to quit, or he would kill me. He laid it down by us. He caught both of my hands in one of his, and held both in that way until he did what he wanted to. He pulled up my clothes, and raped me. His male organ penetrated my female organ. I did all I could to keep him from raping me. I begged him, and, while he held my hands in one of his, I shoved him as well as I could with my arms. I did not kick or scratch him. He was not bruised or scratched, as far as I know. My drawers were torn down one leg. He told me, if I told on him, he would kill my father.' The prosecutrix testified that she went on home, appellant accompanying her, and that they arrived there a little before her sister and Mr. Maltby came; that she slept with her sister that night, and said nothing about it. Said nothing to her people the next morning, and did not mention the matter until in August following, and then she mentioned it only when her sister remarked that something was the matter with her, and she then told her about the rape that had occurred in the pasture, some seven months previous. Her excuse for not telling sooner

was, because the defendant threatened to kill her father if she did, and that he was a dangerous man, and she was afraid of him."

The court, discussing the case, said:

"In this case, however, instead of only three months elapsnig between the alleged offense and the complaint made by the prosecutrix, more than seven months had elapsed, and only when her condition exposed her did she state anything in regard to the matter. This long silence and the circumstances under which she made the accusation should go very far to discredit her, and to suggest that the act of carnal intercourse, if it was with the defendant at all, was with her consent. The excuse she gives, that she feared the appellant would kill her father, under the circumstances of this case, must appear very flimsy indeed. The appellant was shown not to live in the family, and not to have any authority or control over her; and this statement of hers, as a reason for her long silence, does not comport with the integrity of a virtuous female, who has been outraged, and who is jealous of her honor. If we look to the circumstances of the outrage itself as narrated by her, they likewise appear shadowy. There was no attempt at flight, though she was on horseback. No evidence of any injury or struggle. She appears to have unresistingly submitted to being lifted from her horse, and, after the outrage was accomplished, to be lifted back again, by the destroyer of her innocence, to have accepted his escort to her home, and to have gone with him on two sleigh rides a few days afterwards; and all this without any suggestion that he had demeaned himself towards her in any other wise than a manner which met her approval. Under all of the facts of this case, it occurs to us that the lower court should have unhesitatingly granted a new trial in this cause. Although a stricter rule prevails here with reference to a new trial than in the lower court, yet, from the record in this case, we cannot permit this verdict to stand."

The foregoing cases, while all criminal in their character, present no different legal situation, aside from the result of the verdict, than the case at bar. Both civil and criminal prosecutions for rape involve proof of the same elements. One must be proven by a preponderance of the evidence, and the other beyond a reasonable doubt. In the case at bar I assume that the evidence of the prosecutrix is absolutely true, and, so assuming, feel that the same judgment should follow in this case as

Watson v. Taylor.

·was rendered in the civil rape case of *Robinson v. Musser*, 78 Mo. 153, which is, *volenti non fit injuria.*"

The foregoing are but a few cases of which scores may be found where appellate courts have refused to allow verdicts to stand where the evidence was infinitely stronger on the part of the prosecution than in this case, and I have never found one which in weakness has even approached it that has been challenged and sustained. There was evidence offered, as indicated in the opinion of the court, that the plaintiff was of previous chaste and virtuous character, and hence that, even though she consented, rape was committed and she should recover; but it is to be observed that the defendant had no notice of any such charge being made against him. It was not averred in the petition, the case was not tried upon such theory, the court did not instruct upon it, and the defendant was given no opportunity to defend on that ground. I believe that this is the ground this case should have been based upon; that plaintiff should have charged defendant with having had intercourse with her, that she was not his wife, was of the age of seventeen years, and of previous chaste and virtuous character; and substantial justice herein requires that the case be returned and tried upon that ground. If this defendant had intercourse with the plaintiff, though with her consent, and she is of previous chaste and virtuous character, the punishment inflicted upon him herein is wholly inadequate. He should not only be made to suffer civilly, but his act constituted a crime for which the state ought to proceed against him; but in whatever form his punishment comes, it should be according to the law. If we convict guilty men by methods which ignore the law, and its demands, we make it easy to convict innocent men in the same way. If a guilty man can be convicted without evidence, so may an innocent one, and this is the rank danger which lurks in the affirmance of this judgment. I make no claim to being a prophet, but the conclusion reached in this case will be departed from some day. It will not do to say that a man may be convicted of forcible rape on the uncorroborated evidence of a female who weighs one hundred thirty-five or forty pounds, in full possession of all her faculties, right

in the heart of his family, with them all around him and 'undisturbed, when she does not fight, yell, nor complain. Such a holding repeals the statute.

Hence, I feel in this case a judicial crime is being perpetrated, and that this man is being stripped of his property in defiance of and contrary to law.